**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

OLIVETTE COFFEY, JR., et al.,

                          Plaintiffs,

vs.                                                    Case No. 3:71-cv-44-J-32PDB

DWIGHT BRADDY, etc., et al.,

                          Defendants.

_____

## ORDER

      After years of trying to remedy racial discrimination in the City of Jacksonville fire department, a predecessor judge of this Court entered a consent decree in 1982 requiring the City to hire "an equal number of blacks and whites until the ratio of black fire fighters to white fire fighters reflects the ratio of black citizens to white citizens in the City of Jacksonville." Doc. 160, Ex. 5. The City complied until 1992 when it unilaterally, without notice and without the Court's approval, simply stopped following the Court's decree. Immediately thereafter the rate of hiring of black firefighters plummeted. However, it was not until 2007, some fifteen years later, that plaintiffs sought to hold the City to account for its action. By then, much had changed. Thus, the issue is whether the City was wrong to unilaterally cease complying with the Court's Order and, if so, whether plaintiffs have waited too long to say so.[1]

_____

[1]Plaintiffs cannot be held responsible for any delay between 2007 and now. My colleague, Judge Harvey E. Schlesinger, has literally spent years trying to mediate a global settlement of the multitude of suits, including this one, involving alleged racial discrimination in the fire department. Despite some successes with the others, this case did not resolve. Added to that has been the difficulty of litigating a case which began in 1971 and the press

## I.      Background

In January 1971, at a time when only two out of approximately 700 Jacksonville fire department employees were black, Nancy Brackett, a resident of a predominantly black neighborhood in Jacksonville, and Olivette Coffey and Harry Johnson, two young black men with firefighting experience in the military whose applications to join Jacksonville's fire department had been rejected, filed this class action lawsuit claiming the department's hiring practices for new firefighters ("fire privates") violated their civil rights.  Seeking declaratory and injunctive relief under the due process and equal protection clauses of the Fourteenth Amendment, and under the Florida Constitution and Florida law, these plaintiffs sought to represent a class of the black residents of the City of Jacksonville who desired to have their homes and neighborhoods protected by a fire department whose members reflected the diversity of Jacksonville's ethnic and minority populations, as well as a class of black fire private applicants and potential applicants whose applications had been or would be denied because of the fire department's discriminatory hiring process.  The plaintiffs, represented by William Sheppard, a well-known and highly respected civil rights lawyer, alleged that the City's hiring process presented multiple hurdles, including a discriminatory testing process. See Doc. 160 (defendant's hearing exhibits), Ex. 1 (Complaint).[2]

_____

of other judicial business.  Thus, it has taken a long time to reach this point.

[2]The named defendants were members of the City's Civil Service Board, its Fire Chief, and its Personnel Manager.  Throughout the litigation they and their successors are usually collectively referred to as "the City."

Within months, the parties had agreed to a plan that would resolve the issues and on August 12, 1971, United States District Judge Charles Scott, now deceased, issued a consent decree adopting their agreement.  Under its basic terms, the Consolidated City of Jacksonville agreed to conduct a job analysis to reevaluate the qualifications needed to be a fire private; to develop and validate new tests to measure those qualifications; to intensify recruitment efforts in the black community; to offer testing for the position of fire private at a location within the black community; and, in paragraph 7, to "take whatever action is necessary to hire fifty (50%) percent black and fifty (50%) percent white individuals to fill funded positions of Fire Private from the appropriate eligible list until the ratio in the Fire Department of black firemen to white firemen equals the ratio of black citizens to white citizens in the City of Jacksonville, and that such ratio shall be applicable to each such eligible list until no black candidates remain thereon."  Doc. 160, Ex. 2 (August 12, 1971 Consent Decree).  Appointments from such eligible lists were to be governed by "the rule of three"[3] as provided by the civil service rules at the time, although the parties were free to seek a modification for good cause.  Id. at ¶ 7.  The decree further ordered the City to provide the Court with the lists of eligible fire private candidates and those actually hired. Id. at ¶ 9.  The lists of eligible fire private candidates were to be filed for each hiring cycle "until the provisions of paragraph 7 [had] been complied with."  Id.  Finally, the decree provided that "the Court shall maintain continuing jurisdiction of this action."  Id. at ¶ 10.

_____

[3]Under "the rule of three," vacancies are filled by choosing one candidate from the top three.  See Nash v. Consolidated City of Jacksonville, 895 F.Supp. 1536, 1539 (M.D. Fla. 1995).

Shortly thereafter, at the joint request of the parties to conform to a change in the civil service rules, the Court substituted "the rule of 5" for "the rule of 3" in paragraph 7.  Doc. 159 (plaintiffs' hearing exhibits), Ex. 2 (September 29, 1971 Order).  Over the next ten years, defendants filed a number of reports as required by the decree and both sides moved for relief under the decree on various occasions.  On January 23, 1981, the Court entered a lengthy opinion following a hearing on pending motions, including plaintiffs' motion for an order to show cause which claimed that defendants were violating the decree by not hiring enough black fire privates.  <u>See</u> Doc. 160, Ex. 3.  Among other things, that opinion certified the case as a class action and consolidated the lawsuit with <u>Corley v. City of Jacksonville</u>, Case No. 3:80-cv-383-J-S, another class action filed by prospective firefighters who failed the 1979 administration of the fire private test.  In considering the matter of defendants' compliance with the <u>Coffey</u> consent decree, Judge Scott began with these words:

> Discrimination is an abhorrent creature, that preys upon the dignity and sense of self-worth of every victimized individual. It is a changeling that assumes many forms, but none is more distasteful than racial discrimination, in light of its painful and pervasive history in this country. Rightly or wrongly, much of the burden of establishing and enforcing policies and practices aimed at eliminating discrimination has fallen upon the federal courts. Substantial progress has been made, yet the battle is far from over. The truth of the matter is that bigotry and racism are likely never to disappear for we cannot control the hearts and minds of men and women. We can only hope to control the outward manifestations of discrimination.  The courts must remain ever vigilant to ensure that this is done.

Doc. 160, Ex. 3 at 9.

Nonetheless, as the opinion went on to explain, not every action that results in racial disparity is motivated by a discriminatory purpose and, because the defendants had

4

demonstrated that the exam used to screen applicants was "content valid" in that it tested only the "knowledge, skills, and abilities essential to successful performance of the job of Fire Fighter," the plaintiffs' prima facie case was rebutted and, absent a showing of "purposeful discrimination," there was no violation.  Id. at 9-12.  But the Court then cautioned:

> The defendants should not misinterpret the Court's decision upholding the constitutionality of the exam and the cutoff score as a "seal of approval" affixed to their hiring practices relating to the position of fire fighter.  To the contrary, the Court is disappointed that, almost ten years subsequent to its entry of the consent order, the ratio of black to white firemen is still not equivalent to the ratio of black to white citizens in the City of Jacksonville.  It is true that Jacksonville citizens have a right to expect competent, qualified fire fighters able to adequately defend their lives and property.  Nevertheless, it is also true that citizens have an interest in assuring that their race is adequately represented among those fire fighters.

Id. at 12-13.  The Court then reminded the City that it remained bound by the terms of the decree, including particularly the provisions intended to increase the number of black applicants for the position, and the requirement of paragraph 7, establishing the "50-50" hiring formula.  Id. at 13.

The parties continued to litigate defendants' compliance and by November 1982, when it became clear that the use of an eligibility list "continually resulted in more whites being hired than blacks," the list was abandoned altogether and the Court, with the consent of the parties, adopted a stipulation which "impose[d] an absolute requirement" that the department "hire an equal number of blacks and whites until the ratio of black fire fighters to white fire fighters reflects the ratio of black citizens to white citizens in the City of Jacksonville."  Doc. 160, Ex. 5 (November 24, 1982 Order) at 1.  Because the Court had

certified the case as a class action, notice of the proposed change was published in newspapers in general circulation in Duval and other nearby counties, with "[s]pecial effort" made to ensure that the black community had notice.  Doc. 160, Ex. 4 at ¶1(a).

Having largely achieved the relief they sought through their complaint, the plaintiffs moved to recover their attorneys fees and costs, which the parties then litigated until the Court finalized the matter in May 1984.  During that time and thereafter, there were no filings related to the decree and the City presumably hired additional new firefighters in compliance with the one to one hiring ordered by the November 24, 1982 Order.  See Doc. 160, Ex.6 (Coffey docket from 1971-1995).

There was no further activity in the case until October of 2007, when new counsel for plaintiffs appeared, filing a motion for an order to show cause as to why the City should not be held in contempt for failing to follow the terms of the 1982 decree.  The case, which had long been closed, was reopened and assigned to the undersigned.  In their motion, plaintiffs claimed that the City unilaterally stopped obeying the consent decree in 1992 without seeking Court approval and that it therefore had been in contempt for the past fifteen years. Plaintiffs claimed that between 1992 and 1997, the City hired 136 firefighters, yet only a single one was black and that, after 1997, the number of black firefighters hired continued to be far below the number of white firefighters hired, in contravention of the decree's one to one hiring dictate.   See Doc. 6 (Plaintiffs' Motion).

The City responded to the motion and moved to dissolve the decree and dismiss the case with prejudice, arguing that the City had fully complied with the "self-executing" terms of the decree that permitted the City to stop hiring one to one once the black to white ratio

6

of firefighters in the department matched the black to white ratio of the City's population, and that plaintiffs' effort to resurrect the case was barred by laches.[4]  <u>See</u> Doc. 16 (City Response and Motion).  After some early hearings, the Court ordered the parties to engage in global settlement discussions with United States District Judge Harvey E. Schlesinger. Those talks, which began in October 2009 and eventually included the parties in a number of other race discrimination cases involving the fire department, including new actions filed by the Department of Justice and the NAACP, have led to some important successes, but the parties in this case eventually determined they could make no further progress without a ruling on the issues now before the Court.[5]

Thus, the parties undertook discovery, filed pretrial statements and briefs, and presented their cases at a two day evidentiary hearing during which the Court heard testimony from thirteen witnesses, considered additional deposition testimony from four of them, and admitted hundreds of pages of exhibits.[6]  <u>See</u> Docs. 101, 103, 106, 108, 132, 133,

---

[4]The City also argued that plaintiffs lacked standing but that issue was resolved when additional plaintiffs were allowed to replace the original class representatives and their new lawyers were appointed to represent the class.  <u>See</u> Order, Doc. 62.

[5]Judge Schlesinger has worked tirelessly with the parties in attempting to reach resolutions to the complex and long-standing issues presented by these cases.  The undersigned and the community owe Judge Schlesinger a debt of gratitude for his efforts which continue even to this day.

[6]In some of their filings, plaintiffs adverted to discussions from the parties' settlement discussions (<u>see</u> Docs. 102, 103, 108).  The Court has ignored these statements and, to that extent, the City's motions to strike or exclude this evidence (Docs. 109 & 110) are granted. The City also objected to the admission of three attorney-created exhibits plaintiffs obtained during settlement discussions (Plaintiffs' Exhibits 48, 49 and 50).  The Court cannot countenance their admission over the City's objection; doing so would violate this Court's earlier order giving the parties license to explore settlement in good faith, secure in the

134, 135, 136, 152, 153, 157, 158, 159, 160.  The parties submitted post-hearing proposed findings of fact and conclusions of law and the City supplemented the evidence with additional materials discovered after the hearing, the significance of which the parties briefed.  See Docs. 163, 167, 168, 170, 171.  The Court incorporates the record of the evidentiary hearing by reference (Docs. 157 & 158).

## II.    The Legal Issues

Plaintiffs properly challenged the City's compliance with the 1982 consent decree by moving for an order to show cause as to why the City should not be held in contempt.  See Reynolds v. McInnes, 338 F.3d 1201, 1208 (11th Cir. 2003) (explaining that consent decrees are to be enforced through trial court's civil contempt power) (citation omitted); Florida Ass'n for Retarded Citizens, Inc. v. Bush, 246 F.3d 1296, 1298 (11th Cir. 2001) (motion for order to show cause is proper way for plaintiffs to challenge defendant's failure to comply with existing decree) (citation omitted).  In their motion, plaintiffs allege that while the City was in general violation of the decree, it had unilaterally abandoned its most significant provision- - paragraph 7, which required the one to one hiring - -  and had done so without filing a petition to modify or dissolve the decree.  See Doc. 6.  Because plaintiffs' moving papers

---

knowledge that representations made and information shared was protected.  See Order, Doc. 88.  The objection is therefore sustained.  Review of the transcript reveals that plaintiffs had an unresolved objection to City Exhibit 9 which the Court now overrules, albeit with the understanding that the foundation and meaning of the listed figures is questionable.  The City also raised unresolved objections to Plaintiffs' Exhibits 55 & 56 which the Court overrules. While these exhibits should have been listed on plaintiffs' exhibit list, they were apparently produced by the City (based on their Bates stamps) so the City is not prejudiced by their admission and they provide some information as to the fire department's hiring procedures in the time period shortly before the City determined that it had met the decree.

presented a case of non-compliance, the Court set the matter for a show cause hearing. See Order, Doc. 62; Reynolds, 338 F.3d at 1208.  At the hearing, plaintiffs had the burden of proving by clear and convincing evidence that the City was in non-compliance.  Id. at 1211.  The City was given a chance to respond with its own evidence and the Court's task is then to determine whether the City complied with the provisions of the decree "and, if not, decide what sanctions are necessary to ensure compliance." Id. at 1208 (citation omitted).

However, the City has raised the defense of laches, contending that plaintiffs' fifteen year delay in raising this issue has prejudiced the City's ability to defend itself and that plaintiffs are therefore barred from raising a claim of non-compliance.[7]  A defendant is required to show three elements to prove the equitable defense of laches: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." Kason Industries, Inc. v. Component Hardware Group, Inc., 120 F.3d 1199, 1203 (11th Cir. 1997).  See also Stone v. U.S. Postal Serv., 383 F. App'x 873, 874-75 (11th Cir. 2010) (affirming dismissal based on laches where plaintiff's unjustified three year delay prejudiced defendant because key witness had died during interim); Sanders v. Dooly County, 245 F.3d 1289, 1290-91 (11th Cir. 2001) (affirming summary judgment based on laches where six year delay in bringing claim prejudiced defendants due to unreliability of evidence, confusion, and costs

---

[7]Because a consent decree is an order of the court, it is subject to equitable defenses (such as laches), not legal ones. Brennan v. Nassau County, 352 F.3d 60, 63-64 (2d Cir. 2003) (citation omitted).  See also, Bergmann v. Michigan State Transp. Com'n, 665 F.3d 681, 683-84 (6th Cir. 2011) (directing district court on remand to consider whether doctrine of laches barred motion to enforce consent decree).

engendered by delay).

## III.    The Evidence

At the hearing, the Court heard evidence relevant to both the City's compliance with the decree and its defense of laches.  Not surprisingly, however, even with the post-hearing supplementary evidence, the record had frustrating gaps.  Thus, while it is undisputed that the City had stopped hiring one to one by 1992, the evidence is incomplete as to how the City determined it had met the decree's requirement that the fire department's ratio of black firefighters to white firefighters was equal to the City's ratio of black citizens to white citizens. Additionally, the City was unable to provide solid answers as to who decided that the decree was satisfied and who decided that the decree allowed the City to walk away rather than return to Court to seek its modification or dissolution.  Although City employees testified to the best of their recollection, the passage of time and the limited records available made it difficult to reconstruct what happened.  Based on testimony and other available evidence, however, we do know the following:

In September 1991, W. Newby Kelt from the City's Department of Personnel sent a memo to John Delaney (who was then General Counsel), regarding the 1982 consent decree, stating:

> The most recently hired class of firefighters has brought the City into compliance with the consent order requirement that twenty-five percent of our firefighters be minorities.
> What, if anything, must be done now?

Doc. 168-1 at Bates NAACP/JBOF 1324.[8]   Steven Rohan, Deputy General Counsel, responded to Kelt asking him to provide the numbers of black and white fire department employees and the population figures upon which Kelt's request was based.  Id. at Bates NAACP/JBOF 1325.  Kelt provided figures showing that the population of the Consolidated City of Jacksonville was 24.35% black and 25.1% of the fire department's employees were black.[9]   Id. at Bates NAACP/JBOF 1326.   On October 9, 1991, Rohan authored a comprehensive memorandum to Kelt explaining why, in his opinion, the decree had been satisfied, the Court's approval was not needed, and the City would be violating the law if it continued to hire on a one to one "quota" basis.  Id. at Bates NAACP/JBOF 1327-1329.  In that opinion, Rohan explained that because the ratio of black to white firefighters had reached the ratio of black to white citizens in the City, the City had satisfied the decree's requirement that it hire one to one until that ratio was equal and, because the decree did not explicitly require the City to seek dissolution, the provision was "self-executing."  Id. at Bates NAACP/JBOF 1328-1329.  Thus, reasoned Rohan, the decree ceased to operate by its own

---

[8]After the hearing, in the course of discovery in one of the other fire department discrimination suits, the City received records from the Jacksonville Brotherhood of Firefighters.  They are attached as a composite exhibit to Doc. 168; for ease of reference, page numbers are identified by Bates number.  Although the documents plainly originated with the City, most of them were no longer among its records and it was a surprise to all parties in this case when they were produced.

[9]Kelt's population percentage figure is incorrect.  The ratio of blacks to whites was 25.08%.  (The ratio reported by Kelt was the percentage of blacks in the total population which included blacks, whites and others).  See Doc.168-1 at Bates NAACP/JBOF 1326.  Additionally, his figures for the department are the numbers of "employees" as drawn from EEO reports.  Id.  We don't know if this included only firefighters or firefighters and other personnel.

terms and "no further taxpayers' dollars need be expended to seek approval of the City's actions in the United States District Court." Id.

However, it is unclear whether the fire department immediately acted on Rohan's opinion because a year later, Eugene Callahan, a personnel official with the fire department, wrote to Gerald Schneider (now deceased) with the General Counsel's Office, stating that the hiring requirements of the 1971 decree had been met, attaching a document with hiring figures which reflected that blacks made up 25.3% of the fire department personnel, and asking if the intent of the decree was satisfied.  Doc. 160, Ex. 8.  Callahan testified that the department was running out of eligible black firefighters who could be hired and, because Callahan was aware that the ratio of black to white firefighters was near the ratio of blacks to whites in the City's population, he asked whether the City could return to the Court to be released from the decree.  Doc. 152 (hearing transcript) at Tr. 76-77.  Callahan recalled attending a meeting with the Mayor (Ed Austin, now deceased) and John Delaney,[10] who, according to Callahan, advised that the City did not need to return to Court for permission to stop following the decree.  Id. at Tr. 85.

Steven Rohan also testified.  He similarly recalled that the department was having difficulty finding enough blacks to hire to meet the department's staffing needs while under the decree and felt it had reached the required black to white ratio.  Id. at Tr. 156.  Thus, if permissible, the department wanted to be released from the one to one hiring because it was

---

[10]John Delaney, who later became Mayor, was the General Counsel for several months after Mayor Austin was elected. He then became the Mayor's Chief of Staff.  See Doc. 152 (Rohan testimony) at Tr. 152-53.  Callahan referred to him as being the Mayor's advisor at the time of their meeting.  Id. at Tr. 77.

12

stymying the department's ability to hire anyone at all.  Id. at Tr. 156-57.  Rohan said it was his opinion that the City did not need to return to Court to be released from the decree because, if the decree required it, it would have said so explicitly.  Id. at Tr. 144-46.

As Rohan explained in a letter to the President of the Jacksonville Chapter of the NAACP shortly before this litigation was reopened in 2007, the consent decree operated much like a divorce decree in that, just as a divorce decree might require child support payments to be made until the child turns eighteen, or require alimony until the former spouse remarries, the decree's one to one hiring provision was self-executing and lasted only until the ratio of blacks to whites in the department was equal to the ratio in the City's population.  Doc. 159, Ex. 47.  Rohan's letter explained that in such circumstances, "it is generally understood that once the condition takes place, the obligation ceases without the necessity of court intervention."  Id. at 1.  Rohan elaborated his view at the hearing, explaining that where a proposed course of action was premised on the interpretation of a document such as a contract or court order, he frequently advised his clients that there were two options:  follow the proposed course "and see what happens" or "go ask for permission first" and potentially wind up "in litigation for six years first- - or eight years before you ever get an answer, much like this case has been in court for the last four or five years."  Id. at Tr. 141.

But Rohan further insisted that he was not the ultimate decision-maker charged with determining whether the hiring terms of the decree had been met, nor the one who decided to stop following the hiring policies mandated by the decree without returning to the Court. Id. at Tr. 125.  Rohan's October 9, 1991 three-page memorandum to Kelt was not

13

discovered until after the hearing and Rohan was not asked about it.[11]   In fact, his recollection at the time of the hearing was that he informally talked to people and gave advice but did not write an opinion on the matter or take a position on behalf of the City.  Id. at Tr. 125, 144.  Rohan testified that a decision as significant and "politically charged" as discontinuing the decree's one to one hiring mandate would have been made at the highest level such as by the General Counsel and/or the Mayor.  Id. at Tr. 166-67.

Other than the October 9, 1991 Rohan memo to Kelt (which does not show copies to anyone else), there are no documents directing the fire department to stop hiring one to one and there was apparently no public announcement regarding the change.  See id. at Tr. 86-87 (testimony of Eugene Callahan that he did not recall any official announcement or press release).  However, in 1992, the department adopted new hiring policies designed by an industrial psychologist to be "fair" and "non-discriminatory" with the intent of "hiring the most qualified firefighters."  Doc. 160, Ex. 22, ¶ 2.  The new hiring criteria considered the results of an applicant's drug screening, physical fitness test, and included a background investigation into an applicant's criminal history, past employment, financial situation and character, and performance during an oral interview.  Id. at Ex. 1.  The City apparently opted not to bring the new change to the Court's attention when the City was before the Court in September 1992 seeking final dismissal in the related case of Corley v. City of Jacksonville.  See Corley Order of dismissal, Doc. 159, Ex. 5; Doc. 152 at Tr. 132 (Rohan testimony that

---

[11]Following the discovery of this memorandum and other important documents, the Court asked the parties whether they wanted to reopen the hearing but they did not.  See Docs. 169, 170, 171.

the City had stopped hiring one to one by the time of the <u>Corley</u> dismissal).[12]

Based on the record, it is difficult to retrospectively predict whether a timely motion by the City to dissolve or modify the decree in 1991 or 1992 would have met with success. The Court's order adopting the parties' stipulation described the decree as modifying the hiring formula to impose "an absolute requirement" on the department "to hire an equal number of blacks and whites until the ratio of black fire fighters to white fire fighters reflects the ratio of black citizens to white citizens in the City of Jacksonville." Doc. 160, Ex. 5 at 1. The Court's decree also stated that it "approve[d] and adopt[ed] in its entirety the stipulation and agreement entered into by the respective parties to this cause on July 2, 1981." <u>Id.</u> at 2. Yet the parties' July 2, 1981 stipulation used somewhat different language to describe the agreement. There, the parties said the department was to hire 50% black and 50% white individuals "to fill positions in the Fire Department of the Consolidated City of Jacksonville until the ratio in the Fire Department of Black employees to White employees equals the ratio of Black citizens to White citizens in the Consolidated City of Jacksonville." Doc. 160, Ex. 4 at ¶ 4(a). At least three distinctions are potentially relevant.

---

[12]Callahan's memorandum inquiring whether the decree was satisfied is dated September 15, 1992. Doc. 160, Ex.8. The parties' joint stipulation to dismiss with prejudice the related <u>Corley</u> case was filed September 21, 1992 and the Court's Order of dismissal was entered September 28, 1992. Doc. 159, Ex. 5. Rohan testified that he knew the City had stopped hiring one to one by the time <u>Corley</u> was dismissed. Doc. 152 at Tr. 132. Callahan testified that he had just rejoined the department after a change in administration and wrote the memo asking about the decree because he found his predecessor's hiring practices to be confusing. <u>See</u> Doc. 152 at Tr. 76. It is entirely possible that the City stopped hiring one to one after Kelt received Rohan's October 9, 1991 memo (that warned that continued one to one hiring would in fact violate the law) and that Callahan was just not aware of it. Hiring records from 1991-92 and better preserved memories would have shed light on this question.

First, the parties' stipulation required the ratios to be "equal" whereas the Court's Order adopting the stipulation stated the department's ratio should "reflect" the ratio in the population, which could have been a less precise standard to achieve. See, e.g., Burt v. County of Contra Costa, 2014 WL 253010, *12 (N.D. Cal. Jan. 22, 2014) (granting motion to vacate 1975 consent decree upon finding of substantial compliance where decree's use of the word "reflect" did not require percentages of minorities and women employed by County to be "equal" to their percentages in the general county workforce).

Second, while the Court's order described the hiring of "fire fighters," the parties' stipulation referenced the hiring of fire department "employees."  While of course the lawsuit was about the hiring of firefighters, an argument could be made that the parties agreed that the department should hire one to one until the ratio of blacks to whites on its entire staff equaled the ratio in the population.  In fact, Eugene Callahan testified that he was not sure whether the 25.3% figure he used in his memorandum requesting guidance reflected the percentage of black firefighters or all black department personnel. See Doc. 152 at Tr. 83-84; Doc. 160 at Ex. 8.

Third, the parties' agreement stated that the black to white ratio should equal that in the population of "the Consolidated City of Jacksonville" yet the Court's decree said it would reflect that in the population of "the City of Jacksonville."  There is a difference- - the Consolidated City of Jacksonville includes all of Duval County, which is the City of Jacksonville, plus Atlantic Beach, Jacksonville Beach, Neptune Beach and Baldwin. See

16

City Charter (Laws of Fla. Ch. 92-341, §§ 1.101(a), 1.102(a).[13]  And, importantly, the ratio of blacks to whites in the City of Jacksonville is different from that in the Consolidated City of Jacksonville.  In 1990, the City's ratio of blacks to whites was 25.99% black to 74.02% white whereas in all of Duval County (the Consolidated City), the ratio of blacks to whites was 25.08 % black to 74.92 % white.  See Doc. 160, Ex. 40.[14]  If the department was supposed to hire enough blacks to match the ratio of blacks to whites in the City (as opposed to the Consolidated City), it is entirely possible that the City fell short of that bar.

These are all issues that the parties might have litigated and the Court could have resolved on an appropriate record had the City moved to modify or dissolve the decree in 1992.  Trying to do so from today's perspective is impossible.  For example, while the 1990 census data for the City of Jacksonville and all of Duval County is available, the fire department records are incomplete and the available witnesses were unable to reconstruct the information.  See, e.g., testimony of Eugene Callahan (Doc. 152, Tr. 82-89) (testifying that he could not tell whether department employment figures were for firefighters or all personnel and that rosters or payroll information could have been used to collect the data

---

[13]Confusingly, "[t]he name of the consolidated government is City of Jacksonville."  City Charter (Laws of Fla. Ch. 92-341, § 1.101(a).  See also Doc. 152 at Tr. 239-241 (testimony of Calvin Leon Burney, whose job as the director of the City's planning and development includes oversight of census data and who reported that the Consolidated City includes all of Duval County excluding the Beaches and Baldwin).

[14]The population figures reported on this document must be extrapolated to reach the proper percentages because the total number reported included all races, not just blacks and whites.  Thus, for the City, the number of blacks (160,283) and whites (456,539) was 616,812 and the percentages of blacks to whites was therefore 25.99% to 74.02%; for Duval County, the number of blacks (163,902) and whites (489,604) was 653,506 and the percentages of blacks to whites was therefore 25.08% to 74.92%.

but he could not recall); testimony of Wayne McGovern (Doc. 153, Tr. 5-9) (explaining that the fire department's workforce data for 1991-1992 is no longer available); testimony of Archie Cullen (Doc. 152 at Tr. 250-51) (describing City's unsuccessful search of archives, off-site storage facility, human resources department, and information technology department for 1991-1996 employment records, which were likely destroyed in compliance with Florida's document retention schedule).  The Court cannot today determine whether the City had satisfied the terms of the decree in 1992 when it stopped hiring one to one.

Nonetheless, stop it did and the numbers of black firefighters hired dropped dramatically.  For example, from an eligibility list certified in November 1992, the City hired 63 new white firefighters and 8 blacks; from an eligibility list certified in February 1995, the City hired 131 white firefighters, and 1 black.  See Doc. 159, Ex. 54.  The change was not unnoticed but those who inquired were advised that the decree had been met.  For example, Fire Chief Ray Alfred (who is African-American) joined the department in 1995 and noticed right away that minorities were underrepresented in terms of new hires and promotions.  See Doc. 152 at Tr. 103.  Alfred testified that he asked Rohan about the consent decree and was advised that it had ended under the previous Chief's administration.  Id. at Tr. 104-05.  Adrian Johnson, Philip Hopkins, Joseph Moseley, and James J. Hammond, III, African-American firefighters who were hired while the decree was in place, each testified that it was common knowledge that the City had stopped hiring one to one but, when they asked about it, they were advised the decree had been met and did not inquire further at the time.  See id. at Tr. 176-77, 180, 187, 196, 203-04, 211-14, 217-18.

18

However, while none of them recalled taking further steps at the time, the Jacksonville Brotherhood of Firefighters, an organization of minority firefighters to which they all belonged, did take action. The President of the Brotherhood sent a letter on September 7, 1993 to the Mayor, the General Counsel, the Director/Fire Chief, and the City's Chief of Personnel, with copies to members of the City Council, the City's EEOC Department and others, expressing concern that the City was no longer hiring one to one as ordered by the decree and asking for copies of the petition to the federal court seeking a release from the decree. See Doc. 168-1 at Bates NAACP/JBOF 1310-1311. The Brotherhood also asked for copies of any correspondence giving the City "the go-ahead" to stop the one to one hiring. Id. at Bates NAACP/JBOF 1311. Although he apparently did not recall the inquiry when testifying in court or when deposed, Joseph Moseley is listed on the letter as someone the City officials could contact on behalf of the Brotherhood about the matter. Id.

Michael Weinstein, the City's Director of the Department of Administration and Finance, responded on September 30, 1993 (with copies to everyone who received the first letter and Rohan as well), explaining that the decree had extinguished without a court order because its goals had been achieved, much like a parent's obligation to pay child support might expire under a divorce decree when the child turns eighteen. Id. at Bates NAACP/JBOF 1312-1314. The letter attached a copy of the parties' stipulation and the 1982 amended decree adopting it, a copy of the September 19, 1991 memorandum from Kelt to John Delaney seeking guidance because the hiring goals had been achieved, a September 24, 1991 memorandum from Rohan to Kelt asking to see the hiring and population figures upon which his request was based, Kelt's response, and Rohan's October 9, 1991

19

memorandum back to Kelt explaining why the department did not need to report back to the Court, advising that the department would be in violation of the law if it continued to hire one to one, and that it would waste taxpayers' dollars to seek approval.   Id. at Bates NAACP/JBOF 1312-1318, 1324-1331.   The October 9, 1991 Rohan memorandum was described by Weinstein as "the General Counsel Office's Opinion that the Court Order in 71-44-Civ-J-S had been satisfied and that no further legal action by the City was necessary." Id. at Bates NAACP/JBOF 1312.   The letter from Weinstein concluded by acknowledging "the Jacksonville Brotherhood's vigilance in monitoring employment practices" and offering to have City representatives available to discuss the matter further.   Id. at Bates NAACP/JBOF 1313.

There is no evidence one way or the other as to what, if anything, the Brotherhood did with this information at the time it received it in 1993.  Although many of the Brotherhood members had been hired under the decree, we don't know if they contacted Sheppard, the lawyer who represented them, or any other lawyer for that matter, to seek an opinion.

Four years later, in 1997, the Florida Times-Union began reporting on the drop in the number of black firefighters being hired, attributing the decline to the period since 1992 when the City stopped following the decree and discussing a City Council proposal that was feared to make the disparity even worse.  See Doc. 160, Ex. 10, 11, 12, 13, 14.  The media attention prompted Mr. Sheppard to write to the Mayor, suggesting he familiarize himself with the Coffey litigation, described by Sheppard as a suit which led to court supervision of the fire department hiring practices "for a couple of decades."  See Doc. 160, Ex. 15 (September 25, 1998 letter from Sheppard to Mayor Delaney).

20

The initial City Council proposal floundered, but in 1999, after much public debate, the City passed a new ordinance that sought to remove obstacles to minority hiring and had the support of black firefighters, Fire Chief Alfred, and the Mayor.   See Doc. 152 at Tr. 106-07 (testimony of former Fire Chief Alfred); Doc. 160, Ex. 10, 11, 12, 13, 14 (news articles describing public debate and parties' positions).  The 1999 ordinance, still in place today, was designed to create a "fair and equitable" recruitment and hiring process resulting in the hiring of "highly qualified candidates." See Doc. 160, Ex. 18 at 3-4 (memorandum from Office of the Mayor describing new hiring policy).  But, notwithstanding passage of the 1999 ordinance, for a variety of reasons, the fire department continues to have problems attracting black applicants.  See, e.g., Doc. 153 at Tr. 24-41 (testimony of Fire Chief Martin Senterfitt); Doc. 153 at Tr. 44-53 (testimony of Captain Hopkins); Doc. 159, Ex. 30 (2006 Report by Jacksonville Human Rights Commission).   See also NAACP v. Consolidated City of Jacksonville, Case No. 3:13-cv-161-J-32MCR (M.D. Fla., filed Feb. 14, 2013) (lawsuit challenging fire department's recruitment and hiring practices).

In September 2007, the Brotherhood retained new counsel to advise their membership with regard to the circumstances in which the consent decree's hiring mandates ended and the impact of the City's subsequent hiring procedures.  See Doc. 152 at Tr. 202-03 (Hopkins testimony), Doc. 6 (plaintiffs' motion) at 1.  Counsel successfully brought in new class representatives and, although they now represent individual class members and not the Brotherhood, they are before the Court moving to have the City held in contempt for abandoning the decree.  See Docs. 6 & 21 (plaintiffs' motion & reply briefs), Doc. 62 (Order appointing new class representatives and new class counsel), Doc. 153 at Tr. 78-79

(discussion with counsel).

## IV.    Discussion

In 1971, the City agreed to a Court order requiring the fire department to hire 50%

blacks and 50% whites until their ratio in the department equaled their ratio in the City's

population.  Doc. 160, Ex. 2.  Ten years later, still under the decree to hire one to one, the

City had hired 251 new firefighters, only 66 of whom were black.  Doc. 160, Ex. 3 at 3.

Because of what the Court styled as the City's "technical" compliance created by the use of

eligibility lists, the Court did not find the City in violation but the City soon agreed to the terms

of the 1982 decree that imposed an "absolute requirement" that it not hire any whites unless

an equal number of blacks were hired.   Doc. 160, Ex. 3 at 3; Doc. 160, Ex. 5.

The 1982 consent decree was an important and far-reaching order of this Court,

entered  only  because  the  City  had  been  unable  to  achieve  desegregation  in  the  fire

department  under  any  less  onerous  terms.    Indeed,  other  than  the  ongoing  school

desegregation case,[15] this was perhaps the most important civil rights litigation affecting the

City at the time.  And it appears that the City complied with the decree for the next ten years,

hiring black and white firefighters in equal numbers.  Then, in 1992, the City unilaterally

determined that it was done.  And it did so in a manner that made it difficult for anyone else

to know at the time what had happened or why.  If the record we have is all there is, Rohan's

1991 memorandum to Kelt, "the General Counsel Office's Opinion" as the City later called

---

[15]See NAACP, Jacksonville Branch v. Duval County School, 273 F.3d 960 (11th Cir. 2001) (affirming Judge Hodges' determination that 41 years of court supervision should end because school system had achieved unitary status).

it, on which no one else was copied, was all it took to end the City's compliance with the decree and twenty years of litigation designed to remedy the City's past racial discrimination in the fire department.  See Doc. 168-1 at Bates NAACP/JBOF 1312.[16]  Based on this record, it appears that at the time the City stopped complying in 1992, it gave no notice to the Court, the lawyers for the plaintiff class, the public and perhaps even the City Council and the Mayor.  If true, the City's action was unacceptable and potentially contumacious.

The City should have asked the Court to modify or dissolve the decree if it thought it had achieved compliance.  The City's argument that a Court Order of this magnitude would just dissolve of its own accord, like a divorce decree's alimony payments, is simply wrong.  Not surprisingly, the City has pointed to no cases that support that position; indeed, the authorities are to the contrary.  See, e.g., Board of Educ. of Oklahoma City Public Schools v. Dowell, 498 U.S. 237, 249-50 (1991) (holding that good faith compliance with desegregation decree is relevant factor in district court's determination as to whether vestiges of past discrimination have been eliminated such that decree should be terminated); GTE Sylvania, Inc. v. Consumers Union of the United States, Inc., 445 U.S. 375, 386-87 (1980) (referencing "established doctrine that persons subject to an injunctive order . . . are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order") (citations omitted); Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 441 (1976) (stating that School Board would be entitled to release from decree upon district court making factual finding of compliance); Florida Ass'n for Retarded Citizens,

---

[16]Later efforts to explain why the City was no longer following the decree fell back on the Rohan memo.

246 F.3d at 1299 ("[I]f the defendants take the position that the consent decree in this case is no longer justified, they should make an appropriate motion to the district court on remand to have the decree either modified or terminated."); United States v. City of Miami, 2 F.3d 1497, 1505-07 (11th Cir. 1993) (explaining that decision to terminate class action employment discrimination decree should address both compliance intended to remedy consequences of past discrimination and whether objective of eliminating illegal discrimination has been met); Youngblood v. Dalzell, 925 F.2d 954, 961 (6th Cir. 1991) (holding that district court could not dissolve decree without considering objections to dissolution); Vazquez v. Carver, 18 F.Supp.2d 503, 507 (E.D. Pa. 1998) (denying defendant's motion to declare decree terminated and rejecting argument that consent decree terminated by its own terms where four corners of decree did not contain language regarding length of provision).[17]

The original decree provided that "the Court shall maintain continuing jurisdiction of this action," a provision that was not affected by subsequent amendments. See Doc. 159, Ex. 1, 2, 4. Had the City moved to dissolve or modify the decree, all parties would have received proper notice, the Court could have ruled on an appropriate record and the losing side could have appealed if dissatisfied. Instead, the City's chosen course of action deprived

---

[17]Even Ensley Branch NAACP v. Seibels, 31 F.3d 1548 (11th Cir. 1994), the case cited by the City as an illustration of a "self-executing" decree, does not absolve the parties from seeking the Court's imprimatur to modify or dissolve the decree. Indeed, the parties to the decrees at issue in Ensley repeatedly returned to the district court seeking modification or termination of the decrees. See docket for United States v. Jefferson City, Case No. 2:75-cv-666 (N.D. Ala.) (e.g., Doc. 1486, City's 2008 renewed motion to be released from decree; Doc. 1724, Court's 2012 Order granting City's motion to dissolve the decree and dismiss the City as a party to the litigation).

the parties of that right; it was a disservice to the public on this issue of great public importance and showed disrespect to the Court.   And, as we now know, black hiring plummeted once the City released itself from the decree.[18]

If this was 1992, 1993, or 1994 (or perhaps even somewhat later) the Court could consider whether to hold the City in contempt or whether to dissolve or modify the decree. But the City argues that, even if it was in violation, by waiting fifteen years to raise the issue, the gaps in the record are such that the City cannot defend itself, and plaintiffs are therefore barred by laches from obtaining any relief.  See EEOC v. Dresser Industries, Inc., 668 F.2d 1199, 1202 (11th Cir. 1982) (applying laches, finding length of EEOC's five year and eight month delay "intolerable").

While the City did not make any announcement either before or at the time it stopped following the decree, that soon became common knowledge.  See supra, pp. 18-21. African-American firefighters, the Jacksonville Brotherhood of Firefighters, their lawyer Sheppard, and other interested parties knew early on that the City had ceased complying without seeking Court approval, but the plaintiffs waited fifteen years to resurrect the matter.[19]

_____

[18]To be clear, none of the lawyers appearing before the Court now on behalf of the City were involved with the decision to walk away from the decree.

[19]Admittedly, the actual plaintiffs included persons in the community and those not yet hired by the fire department so knowledge among African-American firefighters that the City was no longer hiring one to one is perhaps not fairly imputed to them.  However, those persons were still represented by Sheppard who knew that the City was looking to change its hiring formula at least as early as September of 1998 (and probably well before) when he wrote to the Mayor.  See Doc. 160, Ex. 15.  Additionally, notice of the proposed 1982 amendment to the decree was provided to the class by newspaper publication and there was similar media coverage concerning the public debate surrounding the proposed 1999 change.  See Doc. 160, Ex. 10, 11, 12, 13, 14.  The Court finds that, in addition to the

Absolutely nothing prevented plaintiffs from returning to Court in the early 1990's seeking to hold the City in contempt; thus the plaintiffs' delay was "not excusable." See Kason,120 F.3d at 1203 (to apply laches, court must find "delay was not excusable").

And now it is too late.  The question of whether the City was in fact in compliance with the decree in 1992 and if not, what remedies were available at that point is unanswerable owing to the passage of time.  Called before the Court in 1992 after it stopped complying with the decree, or even in the years immediately following, the City would have had a lot of explaining to do.  But plaintiffs waiting until fifteen years later is simply too prejudicial to the City.  The City personnel who could answer the questions have either passed away or are long gone from the City and do not have good recollections.  The paper trail is also spotty (as evidenced by the late discovery of the 1991 Rohan memo to Kelt in the Jacksonville Brotherhood's files but not the City's) and open to interpretation by those without any personal knowledge.  If there was to be a show cause hearing, the City was entitled to defend it in the 1990's; being asked to do so now is just too difficult.  See Stone, 383 F. App'x at 875 (finding laches applied where death of witness prejudiced employer's ability to defend claim).  Moreover, the City has suffered additional prejudice by intervening events in that it has, since 1999, been operating under an entirely different hiring protocol than that which was in place during the time it was hiring one to one.  Given the changes wrought by the 1999 ordinance (in place for eight years by the time plaintiffs moved to hold

_____

original plaintiffs who were subsequently hired and had notice of the change as early as 1993, African-Americans in the community and those who wanted to be hired as firefighters knew at least by 1999 (and probably well before) that the City was no longer following the one to one hiring protocol.

the City in contempt), returning to the status quo ante of the 1982 decree would be virtually impossible.  See Sanders, 245 F.3d at 1290-91 (citing burden to County of changing districting plan which had already been in place for six years as evidence of prejudice).

Thus, as to plaintiffs' claim that the City failed to satisfy the decree's requirement that it hire one to one until the ratio of black firefighters to white firefighters equaled the number of black citizens to white citizens, the Court finds the claim is barred by laches.  Additionally, while the Court is unsatisfied with the City's explanation that the expiration of the decree was "self-executing" and therefore entitled it to unilaterally cease compliance, that issue too is barred by laches.  The scant record as to how that decision was made or the basis for it renders a further determination of the issue impossible.

In sum, this record is not one upon which the Court today could make the required findings to determine whether to hold the City in contempt.  Plaintiffs' claim is barred by laches.  See Stone, 383 F. App'x at 874 (affirming dismissal of Title VII claim based on laches where plaintiff waited three years without justification to seek reinstatement of administrative case during which time a key defense witness had died); Brennan, 352 F.3d at 64 ("To determine whether [police officer's claims that County violated consent decree] are barred by laches, the district court may wish to consider factors such as whether (and when) [the officer] knew of [the] County's alleged misconduct, whether she inexcusably delayed in taking action, and whether [the] County was prejudiced by any delay."); Sanders, 245 F.3d at 1290-91 (affirming summary judgment on claims for injunctive relief challenging a districting plan created by consent decree on grounds of laches where six year delay in bringing claim prejudiced defendants because census data was unreliable and change would

confuse voters and be unnecessarily costly); Dresser Indus., Inc., 668 F.2d at 1203 ("'Classic elements' of undue prejudice include unavailability of witnesses, changed personnel, and the loss of pertinent records.") (citations omitted); See De La Puente v. Drug Enforcement Admin., 2006 WL 2644926, *5 (N.D. Fla. Sept. 13, 2006) (finding claim barred by laches where plaintiff had no good excuse for ten year delay in bringing motion and government would be prejudiced by having to provide documentation and testimony about ten year old events).

Moreover, even if the Court did not find laches to apply, and even if it had further found the City in contempt, the Court likely could not have simply reinstated the 1982 decree. Changes in the law dating back to the early 1990's have rendered problematic the one to one hiring scheme under the 1982 decree, even to remedy past discrimination. See Ensley Branch, NAACP v. Siebels, 31 F.3d 1548, 1570 (11th Cir. 1994) ("By striving for racial parity rather than an end to racial discrimination, these decrees actually promote racial discrimination in contravention of the Constitution."); City of Miami, 2 F.3d at 1506 (explaining that employment discrimination consent decrees are "not intended to maintain employment quotas") (emphasis in original).  The decree's requirement that the black to white ratio of the fire department workforce equal the black to white ratio of the City's population is also outdated by today's constitutional standards. City of Miami, 2 F.3d at 1509 (explaining that "the proper comparison is between the minority composition of the work force in question and the qualified minority population in the relevant labor market," as

opposed to the proportion of minorities in the area population) (emphasis omitted).[20]

Likewise, changes in the facts would make enforcement impracticable.  The City's 1999 hiring ordinance, in place today, is entirely different from the exam-based policy in use while the 1982 decree was being followed.  Moreover, the 1999 policy was adopted following public debate and seemingly had the support of black firefighters.  See Doc. 160, Ex. 11, 12, 13, 14 (media coverage surrounding proposed policy changes); Ex. 19, 20, 21, 22, 23 (documents outlining department changes based on 1999 policy including formation of oral review board on which 2/5 of the members were black (see Doc. 163 at 9) and establishment of recruitment section).  Adapting the 1982 consent decree to hiring practices that began in

---

[20]These decisions were rendered after the City stopped following the decree.  However, even during the pendency of the decree, affirmative action plans were not without limits.  See, e.g., United States v. Paradise, 480 U.S. 149,178-79 (1987) (upholding court-ordered desegregation decree whose one to one promotions requirement was limited in scope and duration in that it would endure only until the department implemented a procedure without a discriminatory impact, at which point the court would suspend the requirement); NAACP v. Allen, 493 F.2d 614, 621 (5th Cir. 1974) ("[The use of quota relief in employment discrimination cases] is a temporary remedy" whose duration "shall be determined by the district court").  In his 1991 memorandum to Kelt, Rohan cited United Steelworkers of America v. Weber, 443 U.S. 193 (1979), for the proposition that remedial affirmative action measures must be limited in duration.  See Doc. 168-1 at NAACP/JBOF 1329.  He went on to explain that, therefore, the "self-executing" language of the one to one hiring provision was "consistent with the law governing the constitutionality of affirmative action programs."  Id.  In Weber, the Supreme Court upheld an affirmative action plan incorporated as part of a collective bargaining agreement between a union and a manufacturing plant, but noted that the plan "was a temporary measure, not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance" because preferential treatment would "end as soon as the percentage of black [employees] approximate[d] the percentage of blacks in the local work force." 443 U.S. at 208-09.  Notwithstanding that the context presented in Weber was quite different, Weber supports the proposition that one to one hiring should not continue in perpetuity.  However, nowhere does it hold that the end of a court-ordered decree could be "self-executing" and left to the determination of the enjoined party without any notification to or permission of the court.

1999 could well prove problematic.

The Court also considered whether it would have been inclined to modify the decree. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 388 (1992) ("A consent decree must . . . be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law."). See also City of Miami, 2 F.3d at 1505 (holding that "principles articulated in Rufo . . . are applicable to requests to modify or terminate decrees in employment discrimination class actions"). However, given that the decision to modify a consent decree is an exercise of the Court's equitable powers, the Court would not have exercised its discretion to modify the decree here in any event because, as it happens, there is a modern successor which has taken up the mantle of the Coffey suit: NAACP v. Consolidated City of Jacksonville, Case No. 3:13-cv-161-J-32MCR, filed February 14, 2013, is a proposed class action now before the Court that challenges the fire department's hiring and recruiting procedures as being racially discriminatory. In that suit, brought by the Jacksonville Chapter of the NAACP and the Jacksonville Brotherhood of Firefighters on behalf of themselves and the class they propose to represent, the parties have been engaged in earnest settlement efforts for many months which may provide relief to the plaintiffs. See NAACP v. Consolidated City of Jacksonville, Case No. 3:13-cv-161-J-32MCR, Docs. 71, 73, 75, 77 (status reports advising of parties' continuing progress toward settlement). If not, the parties will be entitled to a full airing of the issues, the Court will make its rulings on a complete record, and, if the plaintiffs are successful, the Court will have the full panoply of current remedial measures available to it, a far preferable course to trying to resurrect a now forty-four year old lawsuit. See Reynolds, 338 F.3d at 1219 ("Federal courts

Case 3:71-cv-00044-TJC-PDB  Document 180  Filed 02/16/15  Page 31 of 32 PageID 2890

should not be in the business of running important functions of . . . government for decades at a time").

Having determined that the 1982 consent decree cannot be enforced because of laches, the Court must now formally dissolve it. In addition to its lack of enforceability, the changes in the facts and the law since 1982 render the decree no longer viable. The 2013 NAACP case, which relies in part on some of the same history the Court has recounted in this Order, now becomes the vehicle to address the issue of alleged racial discrimination in the fire department hiring practices.

## V. Conclusion

Reminiscent of Judge Scott's words over thirty years ago,[21] the City should not misinterpret the Court's decision as a seal of approval affixed to its hiring practices and its conduct in this case. However, plaintiffs simply waited too long to bring the City's actions to the Court for redress.

For these reasons, it is hereby

**ORDERED**:

1. Plaintiffs' motion to hold the City of Jacksonville in contempt, requested as relief through their motion for order to show cause (Doc. 6), is **denied**.

2. The City's motion to dissolve the decree and dismiss this case (Doc. 16) is **granted**. The parties' July 2, 1981 stipulation and agreement to amend the 1971 consent decree, adopted by the Court in its November 24, 1982 Order, is dissolved.

---

[21]See Doc. 160, Ex. 3 at 12.

31

3.      The Clerk shall enter judgment accordingly and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 16th day of February, 2015.


_____
TIMOTHY J. CORRIGAN
United States District Judge


s.
Copies:

counsel of record